UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

In Re:

LLS AMERICA, LLC,

　　　　　　　　　　Debtor,

BRUCE P. KRIEGMAN, solely in his
capacity as court-appointed Chapter 11
Trustee for LLS America, LLC,

　　　　　　　　　　Plaintiff,

v.

1140966 ALBERTA, LTD,

　　　　　　　　　　Defendant.

NO:  12-CV-68-RMP

Bankr. Case No. 09-06194-PCW11

Adv. Proc. No. 11-80102-PCW11

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

　　　　This  consolidated  action  was  tried  before  the  Court  on July 7, 2014.
Plaintiff,  Bruce P. Kriegman,  the  court-appointed  Chapter  11  Trustee  for  LLS
America,  LLC  ("Trustee"),  was  represented  by  Michael  Loft  and  Matthew
Mensik  of  Witherspoon  Kelley.   Dillon  Jackson  of  Foster  Pepper  appeared  on

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 1

behalf of Defendants Marvin Toews ("Mr. Toews"), 1140966 Alberta, Ltd. (the "Alberta Company"), TWL Contracting, Ltd. ("TWL"), and 692323 Capital, Inc. ("Capital, Inc.") (collectively, "Defendants," and collectively for entities, "Entity Defendants").

At the beginning of trial, the Court confirmed with Mr. Jackson on the record that Mr. Toews had terminated Foster Pepper as counsel for Mr. Toews and for the Entity Defendants.  Mr. Jackson appeared on behalf of Defendants because the Court denied Foster Pepper's motion to withdraw as counsel, ECF No. 82.  Although Mr. Toews did not attend trial, the Court reminded Mr. Toews during the pretrial conference that he could represent himself at trial, ECF No. 110 at 2.

Having heard witness testimony, having reviewed the admitted exhibits, and being fully informed, the Court makes the following findings of fact and conclusions of law:

**PREVIOUS RULINGS**

**1.    Ponzi Scheme and Insolvency**

On July 1, 2013, the Bankruptcy Court issued its Report and Recommendation Re Plaintiff's Motion for Partial Summary Judgment on Common Issues ("Report and Recommendation"), recommending that the District Court grant the Trustee's Amended Motion for Partial Summary Judgment on two

"Common Issues": (1) Debtor operated a Ponzi scheme; and (2) Debtor was insolvent at the time of the payments made to Defendants.  On August 19, 2013, this Court adopted the Bankruptcy Court's Report and Recommendation and entered an order granting the Trustee's Amended Motion for Partial Summary Judgment on the Common Issues ("Order Adopting Report and Recommendation").  *See* 2:11-cv-00357-RMP, ECF No. 92.  Therefore, this Court has determined that Debtor operated a Ponzi scheme and was insolvent at the time of each of the payments to Defendants.

All of the findings and conclusions set forth in the Report and Recommendation and the Order Adopting Report and Recommendation are incorporated by this reference and are the law of this case.

### 2.    Omnibus Hearing for the Testimony of Charles B. Hall

On January 31, 2014, this Court entered its Order Granting Plaintiff's Motion for Omnibus Hearing.  ECF No. 58.  Pursuant to that Order, the court-appointed examiner, Mr. Charles B. Hall, testified at an Omnibus Hearing in open court commencing on February 25, 2014.  His testimony consists of written direct examination testimony that was filed on or about February 17, 2014, and the oral testimony that he gave at the Omnibus Hearing.  Mr. Hall was cross examined by several defense attorneys, including those from Foster Pepper, and by some pro se

defendants.  Mr. Hall's testimony at the Omnibus Hearing is part of the record in this adversary action.

<h1 align="center">FINDINGS OF FACT</h1>

1.    Debtor is the Little Loan Shoppe group of companies, which was originally formed in 1997.  PO-1 at 11.

2.    Debtor operated a Ponzi scheme, whereby investors' loans were sometimes used to pay other investors' promised returns on investments.  PO-1 at 16.

3.    Over the course of its existence, Debtor acquired approximately $135.4 million in funds invested by individual lenders, documented by promissory notes promising interest in the range of 40% to 60% per annum.  PO-1 at 7 n.2, 15.

4.    Defendants are lenders who received payments from Debtor.

5.    Debtor accumulated payday loan bad debts of approximately $29 million, which were written off in 2009.  PO-1 at 41.

6.    Debtor was never profitable at any time during its existence and, thus, at no time did it generate sufficient profits to pay the amounts due the lenders.  PO-1 at 16, 53.

7.    Defendants 1140966 Alberta, Ltd. and 692323 Capital, Inc. filed proofs of claim.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 4

8.    The relevant conduct largely occurred in Spokane, Washington.  *See* 2:11-cv-00362-RMP, ECF No. 148.

9.    Mr. Toews and the Alberta Company received promissory notes that were executed in Washington State.  *See, e.g.*, P-21 at 5, 7-12, 16.

10.    Debtor ordered "stop payment" on some of the checks that it had given to Defendants, and other checks bounced.  P-53 at 83; P-54 at 154.

11.    Debtor voided approximately 29,000 of the post-dated checks that it had issued to lenders, including Defendants.  PO-1 at 26; P-15; P-40.

12.    Defendants received promissory notes that were "rolled into" or renewed by other promissory notes.  P-10 at 3-4; P-54 at 124-26.

13.    All of the transfers that the Trustee seeks to avoid were made within the period of September 1997 to July 21, 2009.  *See* P-13.

14.    Indicia and characteristics of the Ponzi scheme present in this case include:

a.    Proceeds received from new investors masked as profits from running a payday loan business; PO-1 at 16, 22;

b.    Promise of a high rate of return, usually between 40% to as much as 60%, on the invested funds; PO-1 at 19;

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 5

c.      Debtor paid commissions to third parties who solicited new lenders, typically 10% annually of the amount received from the new lender; PO-1 at 20-21;

d.      Debtor solicited funds as loans evidenced by promissory notes but demonstrated a pattern of "rolling over" the promissory notes when due into new notes instead of paying off the obligation; PO-1 at 26;

e.      Debtor, throughout its history, made false and misleading statements to current and potential lenders; PO-1 at 53-54;

f.      Debtor was insolvent from its inception to the filing of its bankruptcy; PO-1 at 67.

15.     The court-appointed examiner, Charles B. Hall, by way of education, experience, and vocation, is qualified to analyze and review the bona fides of Debtor's operations and to detect a fraud based on Ponzi scheme operations.

16.     Mr. Hall's expert opinion is credible.

17.     Mr. Curtis Frye's testimony, which pertained to Debtor's record keeping and the accounting of investment, payments, and consulting fees/commissions to Defendants, is credible.

18.     Defendants received interest and principal payments from Debtor.

19.     Defendants are "net winners."

20.    The evidence does not show that Defendants conducted meaningful due diligence prior to investing in Debtor.  *See* P-54 at 18-20.

21.    Defendants were promised high rates of return from Debtor of 45%-75% per annum.  P-21.

22.    Defendants received post-dated checks from Debtor in advance of the time that payment would become due under Debtor's promissory notes.  *See* P-54 at 154-55.

23.    Defendants loaned funds to Debtor after Debtor had "rolled" earlier loans into new promissory notes when payment had become due.  P-10 at 3-6.

24.    At all material times, the Entity Defendants acted under the control and at the direction of Mr. Toews.

25.    Mr. Toews was the sole officer, shareholder, and employee of TWL. P-54 at 8.

26.    Mr. Toews attributed personal loans invested with Debtor to TWL to lower his personal income tax.  *See* P-54 at 164-66.

27.    Mr. Toews represented to the third-party investors that TWL would re-invest their monies with Debtor and offered repayment on their investment of 40% per annum interest.  *See* P-54 at 26-27.

28.    TWL issued its own promissory notes and issued its own post-dated checks to the third party investors.  P-54 at 43-44.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 7

29.     TWL, acting through Mr. Toews, used the third-party funds to make investments with Debtor.  P-54 at 25.  Debtor issued promissory notes to TWL or to Mr. Toews, promising to pay interest ranging from 60%-75% per annum, accompanied by post-dated checks that named TWL and/or Mr. Toews as the payee.  *See* P-26; P-28; P-54 at 26-27.

30.     The third-party investors who gave money to Mr. Toews and to TWL generally had no direct business relationship with Debtor.  *See* P-54 at 43-44.

31.     As TWL's president and sole employee, Mr. Toews exercised dominion over payments received by TWL from Debtor.  *See* P-54 at 8.

32.     Mr. Toews was the sole officer and shareholder of the Alberta Company.  P-53 at 18-19.

33.     Mr. Toews formed the Alberta Company to loan money to Debtor and to lower his tax rates.  P-53 at 13-14; P-54 at 28-29.  Mr. Toews used the Alberta Company to lend millions of dollars to Debtor.  *See* P-10.

34.     Mr. Toews represented to third parties that the Alberta Company would invest their monies with Debtor and offered repayment on their investment of 40% per annum interest.  P-54 at 29-30.

35.     The Alberta Company issued its own promissory notes and issued its own post-dated checks to its investors.  P-53 at 51; P-54 at 43-44.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 8

36.    The Alberta Company, acting through Mr. Toews, used third-party funds to make investments with Debtor.  P-54 at 43-44.  Debtor issued promissory notes to the Alberta Company promising to pay interest ranging from 40%-60% per annum, accompanied by post-dated checks that named the Alberta Company as the payee, *see* P-14.

37.    The third parties who gave money to the Alberta Company generally had no direct business relationship with Debtor.  *See* P-54 at 43-44.

38.    The Alberta Company was not adequately capitalized for the activity in which it was engaged.  It had no physical assets and depended entirely on payments from Debtor.  *See* P-54 at 44-46, 150-51.

39.    Mr. Toews used the Alberta Company's funds to pay directly for his personal expenses or to make investments for his personal benefit in unrelated enterprises.  *See, e.g.*, P-23 at 3; P-54 at 151-54.

40.    Mr. Toews changed his investments and those attributed to TWL over to the Alberta Company.  P-25 at 28-29; P-54 at 81-82.  There is no evidence that the transfers were documented or proof that an exchange of reasonably equivalent value took place.

41.    Mr. Toews and the Alberta Company rolled multiple investments, the funds for which stemming originally from Mr. Toews himself and from third

parties, and allowed Debtor to commingle and consolidate those investments into two loans for $715,000.00 and $700,000.00.  P-20; P-54 at 124-26.

42.    Mr. Toews also received commissions from Debtor for soliciting third parties to invest directly in Debtor.  P-53 at 74-75.

43.    Mr. Toews was the President of Capital, Inc., a Panamanian entity. P-53 at 86.

44.    In 2008, Mr. Toews instructed Debtor to name Capital, Inc. as the payee for commission payments already due and owing to Mr. Toews for soliciting individuals to invest directly in Debtor's operation.  P-41; P-45; P-53 at 71-76; P-54 at 61-62.

45.    Mr. Toews directed Debtor to wire payments due and owing to Mr. Toews to an entity in Panama named Crown Gold, Inc. ("Crown Gold").  P-54 at 49-50, 55, 57-58.  Crown Gold purportedly converted its clients' deposits into gold at the current gold price.  P-54 at 49.

46.    Mr. Toews and the Entity Defendants made total payments of $2,719,593.42 to Debtor.   Mr. Toews and the Entity Defendants received payments in the amount of $4,408,282.99 from Debtor.  The difference between money invested and money received (informally referred to by Plaintiff as "MIMO") is $1,688,689.57.  The following summarizes the evidence of payments

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 10

actually made by Mr. Toews and the payments that he received directly from Debtor:

|                     |                                    |
|---------------------|------------------------------------|
| Total Payments:     | $342,554.20 (including Crown Gold) |
| Total Investments:  | $240,000.00                        |
| MIMO:               | $102,554.20                        |

47.    The following summarizes the evidence of payments made by TWL and Mr. Toews and the payments that TWL and Mr. Toews received directly from Debtor:

|                     |             |
|---------------------|-------------|
| Total Payments:     | $88,250.33  |
| Total Investments:  | $20,000     |
| MIMO:               | $68,250.33  |

48.    The following summarizes the evidence of payments made by the Alberta Company and Mr. Toews, and the payments that the Alberta Company and Mr. Toews received from Debtor:

|                     |                 |
|---------------------|-----------------|
| Total Payments:     | $3,913,478.44   |
| Total Investments:  | $2,429,480.00   |
| MIMO:               | $1,483,998.44   |

49.    The following summarizes the evidence of payments made by Capital, Inc. and Mr. Toews, and the payments that Capital, Inc. and Mr. Toews received from Debtor:

|                     |             |
|---------------------|-------------|
| Total Payments:     | $64,000.02  |
| Total Investments:  | $30,113.42  |
| MIMO:               | $33,886.60  |

50.    Total transfers to Defendants are as follows:

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 11

- To Mr. Toews directly:  $342,554.20;

- To TWL and Mr. Toews:  $88,250.33;

- To the Alberta Company and Mr. Toews:  $3,913,478.44;

- To Capital, Inc. and Mr. Toews:  $64,000.02; and

- Grand Total:  $4,408,282.99.

51.    All transfers to Defendants were made with actual fraudulent intent and in furtherance of a Ponzi scheme.

52.    Defendants filed proofs of claim as follows:

- The Alberta Company - Claim No. 277-1; and

- Capital, Inc. - Claim No. 278-1.

53.    Plaintiff requests the Court to pierce the corporate veil and hold Mr. Toews jointly and severally liable for judgments that the Court imposes on the Entity Defendants.  Washington courts have established two factors necessary to show that the corporate form should be disregarded.  "First, the corporate form must be intentionally used to violate or evade a duty; second, disregard must be necessary and required to prevent unjustified loss to the injured party."  *Meisel v. M & N Modern Hydraulic Press Co.*, 97 Wn. 2d 403, 410 (1982) (quotation marks omitted).

A court may pierce the corporate veil under the alter ego theory "when 'the corporate entity has been disregarded by the principals themselves so that there is

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 12

such a unity of ownership and interest that the separateness of the corporation has ceased to exist.'"  *Grayson v. Nordic Constr. Co.*, 92 Wn.2d 548, 553 (1979) (quoting *Burns v. Norwesco Marine, Inc.*, 13 Wn. App. 414, 418 (1975)).  *See also J. I. Case Credit Corp. v. Stark*, 64 Wn. 2d 470, 475 (1964) ("[T]here must be such a commingling of property rights or interests as to render it apparent that they are intended to function as one, and, further, to regard them as separate would aid the consummation of a fraud or wrong upon others.").

Undercapitalization of a corporate entity, by itself, does not constitute abuse of the corporate form, *Norhawk Investments, Inc. v. Subway Sandwich Shops, Inc.*, 61 Wn. App. 395, 399-400 (1991), although "there may be situations in which a corporation is so thinly capitalized that it manifests a fraudulent intent," *Truckweld Equip. Co., Inc. v. Olson*, 26 Wn. App. 638, 645 (1980).

The Court finds that Mr. Toews used the Entity Defendants as his alter egos.  As Mr. Toews acknowledged, he transferred title of personal loans to the entities merely to reduce his personal income tax rate.  *See* P-54 at 163-64, 165-66.  Consistent with that limited purpose, Mr. Toews handled the Entity Defendants as shell companies with little to no assets that might secure the post-dated checks that Mr. Toews issued to investors.  *See* P-54 at 45 ("If I couldn't get paid off LLS, I couldn't pay out."), 155.

Furthermore, Mr. Toews was the sole shareholder of TWL and the Alberta Company, P-54 at 8, P-53 at 19, and received those entities' mail at his personal post office box, P-53 at 39-40.  Mr. Toews also took money from the Alberta Company for personal use when it was available.  P-54 at 31-32.

Although Capital, Inc. included shareholders other than Mr. Toews, P-53 at 86, the foreign company was formed only to allow Mr. Toews to purchase a home in Panama, P-54 at 63.  Also, Capital, Inc. became a repository for the commissions that Mr. Toews received as payment for his apparently personal efforts to solicit new investments for Debtor.  *See* P-53 at 74-76.

Mr. Toews used the Entity Defendants to evade duties that he incurred in what was, in reality, a personal venture.  Furthermore, Mr. Toews significantly underfunded the Entity Defendants.  The Court finds that disregard of the corporate form and imposition of joint and several liability is necessary to minimize the injury to other creditors.  Accordingly, the Court pierces the corporate veil. [1]

**CONCLUSIONS OF LAW**

---

[1] At trial, although Mr. Jackson lacked authority to object on behalf of the defendants in this case, he informed the Court that in related adversary proceedings he intends to argue that Canadian law governs the issue of whether the Court should hold parties jointly and severally liable with their corporate entities.  Because there was no objection to Plaintiff's application of Washington law in this case, the Court assumes without deciding that Washington law governs.

1.   This Court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(d).

2.   This Court has jurisdiction over Defendants.

3.   This action was timely commenced.

4.   At least one unsecured creditor existed who triggered the strong arm power of 11 U.S.C. § 544(b)(1) because the creditor did not and should not reasonably have discovered the fraudulent nature of Debtor's Ponzi scheme transfers within one year before the bankruptcy petition was filed.  *See* 2:11-cv-00362-RMP, ECF No. 197.

5.   Washington State law governing fraudulent transfers applies.

6.   Under the statutes relating to fraudulent transfers, 11 U.S.C. § 548 and RCW 19.40, *et seq.*, payments received from Debtor are recoverable from each Defendant by the Trustee, subject to the defense of good faith pursuant to 11 U.S.C. § 548(c) and RCW 19.40.081(a).

7.   Transfers made in furtherance of a Ponzi scheme constitute actual fraud under the Bankruptcy Code and Washington's version of the Uniform Fraudulent Transfer Act (UFTA).  *See* Bankr. Adv. Doc. 11-80299-FPC, ECF No. 378 at 21-25.  "Where causes of action are brought under UFTA against Ponzi scheme investors, the general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally

invested, those payments are avoidable as fraudulent transfers . . . ."  *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008).

8.     A transferee of a fraudulent transfer may keep funds that it took for reasonably equivalent value and in good faith.  *See* 11 U.S.C. § 548(c); RCW 19.40.081(a).  As recipients of transfers that constitute actual fraud, the burden of proof in establishing the affirmative defense of good faith is on Defendants.  *In re Agric. Research and Tech. Grp., Inc.*, 916 F.2d 528, 535 (9th Cir. 1990); 5 COLLIER ON BANKRUPTCY ¶ 548.09[2][c] at 548-98.2 (16th ed. 2011).

9.     Although "good faith" is not defined precisely in case law, at least one court has noted that the absence of good faith is shown by a transferee who knows that a debtor is operating a Ponzi scheme.  *See In re Agric. Research*, 916 F.2d at 535 (citing *In re Indep. Clearing House*, 77 B.R. 843, 861 (D. Utah 1987)).  The Ninth Circuit has quoted favorably an explanation in an early case that a transferee's "knowledge or actual notice of circumstances sufficient to put him, as a prudent man, upon inquiry as to whether his brother intended to delay or defraud his creditors . . . should be deemed to have notice . . . as would invalidate the sale as to him."  *Id.* (quoting *Shauer v. Alterton*, 151 U.S. 607, 621 (1894)).

10.     Thus, courts measure good faith by an objective standard, looking to what a transferee "'knew or should have known' in questions of good faith, rather

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 16

than examining what the transferee actually knew from a subjective standpoint." *Id.* at 536.

11.     Under the Bankruptcy Code, Washington's UFTA, and relevant case law, the Court does not contemplate a recipient's intent when deciding whether to avoid fraudulent transfers.  5 COLLIER ON BANKRUPTCY ¶ 548.04[2] at 548-63; *Thompson v. Hanson*, 168 Wn.2d 738, 749 (2010).  Accordingly, a transfer that constitutes actual fraud is avoided in its entirety unless the transferee establishes that a reasonable person in the transferee's position would not and should not have known of the fraud, not simply whether he or she *actually* acted in good faith.

12.     Transfers made by Debtor in furtherance of its Ponzi scheme are transfers made with actual intent to hinder, delay and/or defraud creditors under both state law, RCW Ch. 19.40, and federal law, 11 U.S.C. § 548(a)(1).

13.     As discussed above, Defendants terminated their counsel, and Mr. Toews did not attend trial, participate at trial, or offer any evidence; thus, Defendants have not met their burden of establishing that they acted in good faith.

14.     Under RCW 19.40.041(a)(1), RCW 19.40.091(a) and the "strong arm powers" that 11 U.S.C. § 544(b)(1) grants to bankruptcy trustees, all of Debtor's transfers to Defendants, regardless of the date of transfer, are hereby set aside and avoided.

15.     The Trustee is entitled to recover all transfers to Defendants.

16.     The Trustee is entitled to recover all commissions without any right of off set.

17.     The Trustee is entitled to recover all transfers to the "initial transferees" of fraudulent transfers.  11 U.S.C. § 550(a).

18.     Defendants were not a "mere conduit" as a matter of fact or of law with respect to the transfers that Plaintiff seeks to avoid.  The Ninth Circuit has adopted the "dominion" test for determining whether a person or an entity is an initial transferee from whom recovery can be had, or instead, a "mere conduit."  *In re Incomnet, Inc.*, 463 F.3d 1064, 1069 (9th Cir. 2006).  According to the dominion test, "a transferee is one who . . . has 'dominion over the money or other asset, the right to put the money to one's own purposes.'"  *Id*. at 1070 (quotation marks omitted).  The inquiry under the dominion test "focuses on whether an entity had legal authority over the money and the right to use the money however it wished."  *Id.*  A defendant asserting this defense bears the burden of proving that it did not have dominion.  *In re Maui Indus. Loan & Fin. Co.*, 477 B.R. 134, 145 (Bankr. D. Haw. 2012).

19.     Defendants TWL and the Alberta Company, operating through Mr. Toews, were the initial transferees of payments received from Debtor.  *See* P-14; P-26.  Plaintiff is entitled to recover all transfers to these Defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 18

20.     The Trustee is entitled to pre-judgment interest at the applicable federal rate from July 21, 2009, when the bankruptcy case commenced.

21.     Pursuant to 11 U.S.C. § 548(a), 544, 550, and 551 and RCW 19.40.041(1) and 19.40.071, the Trustee is entitled to and is granted a judgment for the benefit of the Liquidating Trust of Debtor against **Marvin Toews** in the amount of **$342,554.20**, plus pre-judgment interest from July 21, 2009, at the applicable federal judgment rate and post-judgment interest at the federal judgment rate from the date of judgment to the date the judgment is paid in full, *see* 28 U.S.C. § 1961.

22.     Pursuant to 11 U.S.C. § 548(a), 544, 550, and 551 and RCW 19.40.041(1) and 19.40.071, the Trustee is entitled to and is granted a judgment for the benefit of the Liquidating Trust of Debtor against **TWL Contracting, Ltd. and Marvin Toews** in the amount of **$88,250.33**, plus pre-judgment interest from July 21, 2009, at the applicable federal judgment rate and post-judgment interest at the federal judgment rate from the date of judgment to the date the judgment is paid in full, *see* 28 U.S.C. § 1961.

23.     Pursuant to 11 U.S.C. § 548(a), 544, 550, and 551 and RCW 19.40.041(1) and 19.40.071, the Trustee is entitled to and is granted a judgment for the benefit of the Liquidating Trust of Debtor against **1140966 Alberta, Ltd. and Marvin Toews** in the amount of **$3,913,478.44**, plus pre-judgment interest

from July 21, 2009, at the applicable federal judgment rate and post-judgment interest at the federal judgment rate from the date of judgment to the date the judgment is paid in full, *see* 28 U.S.C. § 1961.

24.    Pursuant to 11 U.S.C. § 548(a), 544, 550, and 551 and RCW 19.40.041(1) and 19.40.071, the Trustee is entitled to and is granted a judgment for the benefit of the Liquidating Trust of Debtor against **692323 Capital, Inc. and Marvin Toews** in the amount of **$64,000.02**, plus pre-judgment interest from July 21, 2009, at the applicable federal judgment rate and post-judgment interest at the federal judgment rate from the date of judgment to the date the judgment is paid in full, *see* 28 U.S.C. § 1961.

25.    The Trustee is entitled to reimbursement of its costs for pursuing this action.

26.    All proofs of claim filed by any of the defendants in Debtor's Bankruptcy proceedings or any claims that may hereafter arise are hereby disallowed pursuant to 11 U.S.C. § 502(d) unless and until the avoided transfers are returned to the Trustee.

27.    Trustee is awarded all applicable interest, costs and disbursements of this action against each Defendant.

/ / /

/ / /

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 20

1    28.    Because the Court has pierced the corporate veil, Mr. Toews is

2  jointly and severally liable for the amounts awarded against the Entity Defendants.

3    **IT IS SO ORDERED**.

4    The District Court Executive is hereby directed to enter this Order and to

5  provide copies to counsel.

6    **DATED** this 5th day of August 2014.

7

8                    *s/ Rosanna Malouf Peterson*
                ROSANNA MALOUF PETERSON
9            Chief United States District Court Judge

10

11

12

13

14

15

16

17

18

19

20